**ECHO TRAVEL, INC.,
Plaintiff–Appellant,**

**v.**

**TRAVEL ASSOCIATES, INC.,
Defendant–Appellee.**

**No. 87–2864.**

United States Court of Appeals,
Seventh Circuit.

Argued Nov. 1, 1988.

Decided March 20, 1989.

Thomas M. O'Malley, Willian Brinks Olds Hofer Gilson & Lione, Ltd., Chicago, Ill., for plaintiff-appellant.

Nancy J. Sennett, Foley & Lardner, Milwaukee, Wis., for defendant-appellee.

Before COFFEY, FLAUM and MANION, Circuit Judges.

FLAUM, Circuit Judge.

This is a diversity case that involves the Wisconsin common law of unfair competition. Plaintiff–Appellant Echo Travel, Inc. ("Echo") filed suit against Defendant–Appellee Travel Associates, Inc. ("Associates"), alleging that Associates had attempted to pass off[1] its vacation tour ser-

---

**1.** Although Echo phrased its complaint in terms of "passing off," there was no proof of fraudulent intent. Such proof is not required, however. As explained by Professor McCarthy:

The term "palming off" and its synonym, "passing off" are often loosely used in judicial opinions and lawyers' briefs. Sometimes these terms are used to mean one thing and another time something else. The terms "palming off" or "passing off" have been used by various courts to refer to at least three different and distinct situations: (1) substitution of one brand of goods when another

brand is ordered; (2) trademark infringement where the infringer intentionally meant to defraud and confuse buyers; and (3) trademark infringement where there is no proof of fraudulent intent, but there is a likelihood of confusion of buyers.

\*    \*    \*    \*    \*

Many judicial opinions use the terms "palming off" or "passing off" when all that is at issue is the likelihood of confusion caused by defendant's use of a mark which is similar to plaintiff's. . . .

vices as those of Echo, by distributing and using a promotional poster which was substantially identical to a poster used by Echo. Echo also filed a motion for a temporary restraining order (TRO) to restrain Associates from using the poster. After an evidentiary hearing, the district court denied the motion for a TRO. Associates then moved for summary judgment, which was granted. Echo appeals from the order of the district court granting summary judgment in favor of Associates. 674 F.Supp. 656. The sole issue on appeal is whether Echo raised a genuine issue of material fact as to whether its poster had acquired secondary meaning. We find that there exists no genuine issue of material fact, and we therefore affirm.

## I.

Both Echo and Associates are travel agencies and tour operators that engage in the marketing, selling, and arranging of spring break tours for college students to, among other places, Daytona Beach, Florida. At the time of the TRO hearing held in January 1987, both parties had been in the Daytona Beach market for approximately eight to nine years.[2] Both companies use primarily two methods of advertising to promote their spring break trips: (1) print advertisements in student newspapers; and (2) the distribution and posting of flyers, brochures, and posters. At each campus, the companies work with the student activities office, school clubs, fraternities, and individual student representatives (collectively, "tour marketers") who are responsible for placing the newspaper ads, distributing the literature, posting the posters, and signing up students for the trips. The advertising campaign begins in the summer or fall preceding the spring in

which the trips are actually conducted, so that each campaign roughly corresponds to an academic year.

For at least four years prior to the 1985–86 campaign, Echo had used a photograph of a catamaran for its promotional poster. In the summer or early fall of 1985, Echo decided to select a new photograph. Echo's president, David Vander Veen, contacted an advertising agency named Jiloty, Shipley & Associates ("Jiloty"), that was responsible for developing an annual (calendar year) promotional poster for the Daytona Beach Resort Area/Chamber of Commerce ("Daytona Area"). Each year, Jiloty prints "thousands"[3] of Daytona Area posters, which it freely distributes and makes available upon request to hotels and motels, tour brokers, travel agencies, television and radio stations, college newspapers, and magazines. Vander Veen asked Jiloty if Echo could use some of the "outtakes"[4] from the 1985 Daytona Area poster. In response, Jiloty sent to Echo one of the outtakes from the 1985 photography. The outtake photograph showed a beach scene in which a muscular male model is perched atop a lifeguard stand; a female model is standing on the sand, smiling and leaning her back against the lifeguard stand; and a second male model is facing the female, leaning one hand on the stand, and appears to be talking to her. All three models are college-age and clad in bathing suits (the "1985 beach scene"). Echo used this photograph for its 1985–86 poster and used it again for its 1986–87 poster.

In the fall of 1986, Associates, dissatisfied with its previous years' posters, contacted Jiloty to see if it could be of assistance in designing a poster for use in Associates' 1986–87 advertising campaign. Michael Jiloty informed Associates that the

---

1 McCarthy, *Trademarks and Unfair Competition* § 25:1 at 232, 234 (2d ed. 1984). As will be seen, this case falls within the third category listed above.

**2.** Testimony at the TRO hearing established that Echo had been in the Florida spring break business for eight to nine years and that it billed itself as "the largest in college tours to Florida for over 7 years." Associates had been in the Daytona Beach market since 1978.

**3.** The record does not reveal a more exact number.

**4.** During a shooting session, the photographer snaps numerous shots of the same scene. The differences among the resulting prints may be minor. For example, the model may simply have moved an arm or tilted his or her head from one shot to the next. Only one of the shots is eventually chosen for use; the rest are called "outtakes."

transparencies for the 1987 Daytona Area poster would not be ready for approximately four to six weeks, and that he was unable to supply an outtake transparency from the 1986 Daytona Area poster because of technical limitations. (The 1986 Daytona Area poster was a composite of several previous years' posters and included the 1985 beach scene). Jiloty offered to, and did, send to Associates an outtake transparency from the 1985 beach scene. Thereafter, Associates used the outtake to develop its 1986–87 poster. Uncontradicted testimony at the TRO hearing established that Associates was unaware of Echo's use of the 1985 beach scene when Associates developed its poster using a substantially similar outtake of the same scene.

In January 1987, Echo filed an action for unfair competition against Associates. In granting Associates' motion for summary judgment, the district court ruled that: (1) the 1985 beach scene is not inherently distinctive; (2) Echo had no exclusive ownership rights in the photograph; and (3) Echo could not establish that the photograph had acquired secondary meaning. Echo challenges only the third ruling, arguing, in part, that the district court erred by relying on the fact that Echo had no exclusive ownership rights in the photograph to determine that the photograph had not acquired secondary meaning.

## II.

The law of unfair competition includes common law trademark infringement. To establish a case of unfair competition based on trademark infringement, a plaintiff must prove two elements: (1) validity of the mark in question; and (2) infringement. *See* 1 McCarthy, *Trademarks and Unfair Competition* § 15:1 at 657 (2d ed. 1984) [hereinafter "McCarthy"]. Validity of the mark goes to whether the plaintiff's symbol is protectible as a trademark—*i.e.*, whether it is recognized by the public as identifying and distinguishing plaintiff's goods or services. Infringement goes to whether the defendant's actions have caused a likelihood of confusion among consumers as to the source of the goods or services. *Id.* The issue on appeal concerns only the first element—the validity of the 1985 beach scene as Echo's alleged picture-mark.[5]

As explained by Professor McCarthy, validity of a mark can be shown "in either of two ways: (a) that plaintiff's symbol was inherently distinctive; or (b) that even if not inherently distinctive, the symbol has become distinctive through the acquisition of 'secondary meaning.'" McCarthy § 15:1, at 657. Here, Echo does not claim that the beach scene is inherently distinctive;[6] thus, Echo must show that its picture-mark has acquired secondary meaning —*i.e.*, that there is "a mental association in buyers' minds between the alleged mark and a single source of the product." McCarthy § 15:2, at 659 (emphasis omitted). The public need not be aware of the name of the source; the plaintiff can establish secondary meaning by showing that

5. Under Wisconsin common law, a picture can serve as a trademark. In *First Wisconsin National Bank v. Wichman,* 85 Wis.2d 54, 270 N.W.2d 168, 172–73 (1978), the Supreme Court of Wisconsin expressly adopted the following Restatement (Second) of Torts definition of a trademark:

> A trademark is a word, name, symbol, device, letter, numeral, *or picture,* or any combination of any of them in any form or arrangement, which is used by a person on or in connection with goods or services in a manner which identifies them as his and distinguishes them from those of others....

Restatement (Second) of Torts § 715 (Tentative Draft No. 8, 1963).

6. Fanciful, arbitrary, and suggestive marks are considered to be inherently distinctive, in the sense that they "are capable of functioning immediately upon use as a symbol of origin." McCarthy § 15:1, at 656. For example, a coined term such as "Kodak" had no other meaning prior to its adoption and use in connection with photographic equipment. Thus, such a mark is presumed to achieve "customer recognition and association immediately upon adoption and use." *Id.* In contrast, a descriptive term (*e.g.,* "BEST") or picture (*e.g.,* the beach scene in this case) has a pre-existing or "primary" meaning and, thus, one cannot *presume* that the public recognizes and associates the term or picture with plaintiff's products or services. Rather, the plaintiff must show that the term or picture has acquired "secondary meaning." McCarthy § 15:2 at 660.

"the public is aware that the product comes from a single, though anonymous source." *Union Carbide Corp. v. Ever–Ready, Inc.,* 531 F.2d 366, 380 (7th Cir.1976).

In determining whether a mark has acquired secondary meaning, the courts consider several factors:

*Direct Evidence*

(a) direct consumer testimony

(b) consumer surveys

*Circumstantial Evidence*

(c) exclusivity, length, and manner of use

(d) amount and manner of advertising

(e) amount of sales and number of customers

(f) established place in the market

(g) proof of intentional copying.

*See Vaughan Manufacturing Co. v. Brikam International, Inc.,* 814 F.2d 346, 349 (7th Cir.1987); *Gimix, Inc. v. JS & A Group, Inc.,* 699 F.2d 901, 907 (7th Cir. 1983); *Union Carbide Corp. v. Ever–Ready Inc.,* 531 F.2d 366, 380 (7th Cir. 1976); *American Scientific Chemical, Inc. v. American Hospital Supply Corp.,* 690 F.2d 791, 793 (9th Cir.1982); *see also* McCarthy §§ 15:9–15:20. Echo asserts that it submitted sufficient evidence on five of these seven factors; no consumer surveys were offered, and no evidence of intentional copying was offered. We will consider the remaining five factors.

*Direct Consumer Testimony*

Echo submitted, as direct consumer testimony, five form affidavits executed by tour marketers. The five affidavits were set up as follows:

1. That I am [name of affiant] at the [name of school] with the [fraternity or student activities office].

2. That my duties as such are to operate and market tours on the [name of school] campus, and included in that would be coordinating student Winter and Spring break trips.

3. That I performed these duties during the school year 1985–1986.

4. That I am familiar with the ECHO TRAVEL posters used for the Spring break Florida trip during Spring 1986 and Spring 1987.

5. That I directly associate the picture on that poster, that is, the scene, color, etc. with the ECHO TRAVEL tour to Daytona Beach and no other tour.

Of the five first paragraphs, two affiants stated that they were with a fraternity, and three stated that they were with a student activities office.

The district court struck the affidavits on the ground that the affiants were not members of the relevant consumer class, and their testimony was, therefore, irrelevant. The district court defined the relevant consumer class as college students. Echo claims that the district court erred in striking the affidavits because (1) the consumer class should not have been limited to college students, (2) two of the affiants were college students, who had taken Echo trips to Daytona, and (3) the three non-student affiants were university officials who had also taken Echo trips.

In support of its argument that the district court defined the consumer class too narrowly, Echo merely points to the fact that its complaint stated that it arranged tours "for college students *and others*" and to the fact that three of the affiants identified themselves as being "with" a student activities office. These facts add nothing to the discussion. Moreover, Echo's argument is belied by the fact that both its complaint and its briefs to this court repeatedly state that the tours were arranged for *"college students"* during *"college spring breaks,"* that the tours were advertised at *"colleges and universities in the U.S.,"* and that as a result of its poster advertising *"college students sign up"* for the tours. The district court properly held that the consumer class consisted of college students.

Echo next argues that two of the affiants were college students who had taken the trips. The affidavits do not so state. As to whether the affiants were students, Echo asks us to infer their status as students from the fact that they stated that they were "with" a fraternity. Echo argues that on a motion for summary judg-

ment inferences must be drawn in favor of the nonmoving party. Echo misunderstands the rule about inferences. That rule goes to the evaluation of *admissible evidence*, not to the determination of *whether evidence is admissible*. For all we know, the affiant could have been an alumnus director or janitor "with" the respective fraternity. As to whether these affiants took Echo trips, this court will not consider facts asserted in a party's brief or in oral argument that are not reflected in the record.

Finally, Echo argues that the testimony of the three affiants who identified themselves as being "with" a student activities office was relevant because (1) they were university officials, (2) they had taken Echo tours, and (3) they were exposed to a number of merchants selling spring break tours and were thus in the position of independent dealers (whose views might be probative of secondary meaning[7]). Again, the affiants do not so state, and we will not consider unsubstantiated assertions of fact in a party's brief or oral argument. We do not know from the record whether these affiants were university officials or part-time clerical workers. We do not know whether these affiants took Echo tours, and, even if so, whether they purchased the trips or were provided free trips or discounts in return for marketing Echo tours. We do not know whether these affiants

dealt exclusively with Echo tours or dealt with numerous merchants' tours.

In sum, considering the several deficiencies in the affidavits, the district court properly excluded them from evidence.

### Length and Exclusivity of Use

In evaluating this factor, the district court held that:[8] (1) because Jiloty freely distributed the beach scene photograph to others, without any restrictions on its use, the photograph was in the public domain and Echo had no exclusive ownership rights in it; and (2) the length of Echo's use (one season prior to Associates' adoption) was so brief that the probability of Echo's having established secondary meaning was very minute. Echo argues that the district court erred in focusing on ownership rights and in determining that one season of use was insufficient.[9]

Echo is correct that exclusive ownership rights are not relevant to the inquiry into secondary meaning. Ownership of a photograph is one kind of property right; trademark protection is another. *See* McCarthy, §§ 2:6–2:7. Indeed, establishing that a mark has acquired secondary meaning is precisely what removes the mark from the public domain (at least to the extent that second comers may not use the mark as an indicator of origin for the same goods or services). Thus, to say that a mark has not

---

**7.** Professor McCarthy has stated:
> The conclusory testimony of dealers and wholesalers as to consumer recognition is often characterized as of "little value," since it may be biased and does not necessarily reflect the views of the consumer class. If the relevant buyer class is primarily consumers, then conclusory testimony of dealers is merely opinion evidence as to what their customers have in mind. Thus, opinion testimony of retailers as to the mental associations of consumers may be inadmissible as hearsay.

McCarthy, § 15:13 at 688–89. On the other hand, in *Ideal Industries, Inc. v. Gardner Bender, Inc.*, 612 F.2d 1018, 1023 (7th Cir.1979), we found that the testimony of independent wholesalers, who purchased the product at issue from several manufacturers, was probative evidence on the issue of secondary meaning. We specifically noted in that case, however, that the testimony of a party's own sales representative was properly discounted by the district court. *Id.* at 1023.

**8.** Echo argues that the district court failed to systematically consider each factor, and failed to give any consideration at all to evidence of advertising efforts, sales volume, and place in the market. Echo is correct that the district court's analysis of secondary meaning was brief, and that the court did not articulate the factors exactly as we have enumerated them. However, it is clear that the court focused its attention on the disputed issues and, in particular, on length and exclusivity of use.

**9.** The district court also considered the fact that Echo's and Associates' posters were not identical. Echo correctly points out that similarity of marks is not relevant to the issue of whether the plaintiff's mark has acquired secondary meaning. Similarity of marks is relevant only to the issue of whether there is a likelihood of confusion. *See, e.g., Thompson Medical Co. v. Pfizer Inc.*, 753 F.2d 208, 213 (2d Cir.1985).

acquired secondary meaning *because* it is in the public domain begs the question.

However, the fact that Jiloty freely distributed thousands of 1985 Daytona Area posters to various entities, including college newspapers, *is* relevant to the issue of secondary meaning. For the focus of the inquiry is *use*. And while evidence of third party use is not conclusive, third party use of a substantially similar mark to promote the same goods or services to the same consumer class weighs against a finding that the consumer class associates the mark with *one* source. McCarthy, § 15:9 at 681. Here, third parties used a substantially identical beach scene to promote Daytona Beach vacations to, among others, college students. The record does not establish the exact extent of the third party use, but we do know that "thousands" were distributed in 1985 prior to Echo's adoption of the photograph. We note also that the 1986 Daytona Area poster was a composite of several previous years' posters, including the 1985 beach scene poster.[10]

In considering the length of use, Echo correctly points out that "[n]o particular period of use is required. In some cases, the special significance [secondary meaning] is acquired after a brief period of use...." Restatement (Second) of Torts § 715, comment d (Tentative Draft No. 8, 1963); *see also* McCarthy, § 15:20 at 701 ("There is no fixed rule as to the length of time a symbol must be in use before it can achieve secondary meaning."). In arguing that its one season (Fall 1985 through Winter 1986) of use, during which "a torrential storm of Echo posters [were] at 200 college campuses all over the country," was sufficient to raise a genuine issue of material fact as to the existence of secondary meaning, Echo relies primarily on *Paramount Pictures Corp. v. Worldwide Entertainment Corp.*, 195 U.S.P.Q. 539 (S.D.N.Y. 1977). In that case, the court held, on a

preliminary injunction motion, that Paramount was likely to succeed in establishing secondary meaning in its "KING KONG" poster, which had been in use for approximately ten months. However, the court did not base its finding on length of use. Paramount had released the poster in conjunction with a massive advertising campaign for its remake of the motion picture, "King Kong." The court relied on plaintiff's strong consumer survey evidence, distribution of 40,000 posters, and massive newspaper advertising showing large illustrations of the giant gorilla astride the twin towers of the World Trade Center. The point about length of use that can be drawn from *Paramount* is that a short period of use does not *preclude* a party from demonstrating secondary meaning. But a short period of use does not factor in favor of the plaintiff. If anything, it weighs against the plaintiff. And so we must look at the remaining factors to see if Echo has raised a genuine issue of material fact.

*Amount and Manner of Advertising*

The record shows that Echo placed approximately 25,000 beach scene posters on college campuses in the 1985–86 season. The breakdown was approximately 100 to 200 posters placed on each of some 200 college campuses, suggesting that approximately 125 posters would be on each campus. Echo claims that these figures reflect a "deluge" of posters "that even the most myopic or inattentive campus stroller could not help but notice." Despite Echo's claim of "massive exposure," however, these figures cannot be evaluated in a vacuum. For example, the record also reflects that the posters remained posted only until someone (presumably some student) tore them down. We do not know whether the posters remained posted for five minutes or five months.[11] Further, the record does

10. Associates' adoption of the beach scene in Fall 1986 is not considered in assessing whether Echo's beach scene had previously acquired secondary meaning. However, concurrent use by Jiloty/Daytona Area during the 1985–86 season (*i.e.,* use of the 1986 Daytona Area poster) is relevant to whether consumers associated the beach scene with a single source.

11. Echo asks us to also consider the 25,000 posters it distributed in the 1986–87 season and thus claims that a total of 50,000 posters were in circulation. First, there is no evidence that any of the 25,000 1985–86 posters remained posted on campus until or through the 1986–87 season. Second, the issue is whether Echo's poster had

not reflect the student populations or geographical areas of these some 200 campuses, so we do not know whether 25,000 posters represented a "deluge" or a "drop in the bucket." Finally, there is no evidence as to whether poster advertising—as opposed to, say, word of mouth, cost of trip, popularity of vacation location, or influence of roommates and peers—was a particularly successful or noticed form of advertising among college students. Thus, the 25,000 poster figure sheds little probative light on the question of whether college students may have associated the beach scene poster with Echo tours. *See* McCarthy, § 15:16 at 696 (it is the *effect* or *success* of the advertising, not the mere *fact* of advertising, that is the test of secondary meaning).

On the other hand, however, the record indicates that Echo also used the beach scene in its student newspaper advertisements.[12] And we can assume from the fact that Echo (and other tour companies) spent money on poster advertising, year after year, that poster advertising had some effect on college students. The question is whether evidence of 25,000 posters (and some ads in student newspapers) is sufficient to raise a genuine issue of material fact as to the existence of secondary meaning. We believe the advertising evidence, standing alone as circumstantial evidence, is insufficient.

Echo argues, however, that we must also look at the *manner* of advertising and, in this regard, claims that the "eye-catching" and "breath-taking" nature of the beach scene is convincing evidence of secondary meaning. A party's subjective, self-serving view of its own alleged trademark is not competent evidence on which to base a finding of secondary meaning.

*Amount of Sales and Numbers of Customers*

Echo ran 10,000 trips to Daytona Beach in the spring of 1986, resulting in a sales volume of about $2 million. During that same season Associates ran 400 trips. Echo points to its 10,000 trips in 1986 and Associates' "paltry" 400 trips as evidence of the "tremendous success" of Echo's new beach scene poster. The record also shows that Associates ran 3,000 trips in 1985 (the season before Echo began using the beach scene poster) and anticipated running 8,000 trips in 1987 (the season in which Associates began using the beach scene poster). Echo argues that Associates' 8,000–trip figure for 1987 reflects customer recognition of the beach scene poster.

Again, Echo is viewing the evidence in a vacuum. For example, Echo presented *no* evidence of its sales volumes prior to or after the 1985–86 season, and, thus, there is no way to measure whether the beach scene poster impacted its sales volume. Further, uncontradicted testimony at the TRO hearing established that Associates deliberately scaled down its Daytona efforts for Spring 1986 to instead focus its marketing efforts on Padre Island, Texas. Finally, the record shows the following sales volumes for two other companies in the Daytona market: Campus Marketing ran 13,000 trips in Spring 1986 and Designers of Travel was known to run 8,000 to 9,000 trips each spring. The following chart represents the record evidence. The figures for Designers of Travel are an approximation based on testimony elicited by Echo's own counsel that Designers "do eight to nine thousand to Daytona Beach" for spring break.

| Spring | 1985 | 1986 | 1987 |
|---|---|---|---|
| Echo | | 10,000 | |
| Associates | 3,000 | 400 | 8,000 |
| Campus Marketing | | 13,000 | |
| Designers of Travel | 8,500 | 8,500 | 8,500 |

Given the uncontradicted testimony that Associates' 400 trips in 1986 reflected its decision to focus instead on Padre Island, Texas, and the fact that Echo's 1985 and 1987 figures were not presented for com-

---

achieved secondary meaning *before* Associates introduced its poster.

**12.** Vander Veen testified as follows: "We have used the poster method since we started operating tours, spring break tours to Florida. We have set up a couple of different ad campaigns, advertising campaigns over the years. Our most—our present advertising campaign we began about a year and a half ago with the specific type of picture that we use in both our poster and our newspaper advertisement."

parison (nor, for that matter, were Campus Marketing's), the sales volume figures fail to raise a genuine issue as to the beach scene poster's impact on sales and, thus, on the question of whether the poster acquired secondary meaning.

### Established Place in the Market

Echo's only evidence on this point was the testimony of its president that Echo was the dominant firm in the Florida spring break market. However as stated above, in 1986, Campus Marketing ran 300 more trips to Daytona Beach than did Echo, and no evidence was offered regarding other Florida cities.

### Summary

■ Summarizing the factors in this case, we find that: (1) no competent direct consumer evidence was submitted; (2) no consumer surveys were presented; (3) evidence of the length and exclusivity of use does not weigh in favor of Echo and, if anything, weighs against it; (4) the amount of Echo's advertising (25,000 posters at 200 campuses) sheds, some, but little, probative light on the issue of secondary meaning; (5) the evidence of sales volumes and number of customers is insufficient to draw any conclusions; (6) the evidence was insufficient to show Echo's established place in the market; and (7) there was no proof of intentional copying. The evidence fails to raise a genuine issue of material fact on whether Echo's posters acquired secondary meaning.

For the reasons stated herein, the judgment of the district court is AFFIRMED.