**ZIP DEE, INC., Plaintiff,**

v.

**DOMETIC CORPORATION, Defendant.**

**No. 93 C 3200.**

United States District Court,
N.D. Illinois, Eastern Division.

Sept. 29, 1995.

James J. Hill, Harry M. Levy, Emrich & Dithmar, Chicago, IL, for plaintiff.

Peter Vincent Baugher, Kenneth Emanuel Kraus, Schopf & Weiss, Chicago, IL, William G. McGuinness, David C. Radulescu, Fried, Frank, Harris, Shriver & Jacobsen, New York City, for Defendant.

## MEMORANDUM OPINION
## AND ORDER

SHADUR, Senior District Judge.

In this, the most recent skirmish in an ongoing battle between Zip Dee, Inc. ("Zip Dee") and The Dometic Corporation ("Dometic") over patent and trademark rights in slatted awning covers for recreational vehicles, Zip Dee has renewed its Fed.R.Civ.P. ("Rule") 12(f) motion to strike Dometic's Twelfth Affirmative Defense ("AD 12"). Specifically Zip Dee argues that Dometic will be unable to prove any set of facts showing that Zip Dee engaged in inequitable conduct[1] in the course of acquiring a trademark for the overall configuration of its slatted awning cover. For the reasons stated in this memorandum opinion and order and based on the facts before this Court,[2] Zip Dee's motion to strike is denied in principal part and granted in limited part.

### Facts

In 1967 Zip Dee obtained a patent for an awning cover, consisting of a single sheet of flexible metal, for use on recreational vehicles. Two years later Zip Dee began fabricating a flexible awning that comprised a series of metal slats, so that it could be rolled up and stored. It is not disputed that the 1967 patent was broad enough to cover the

---

1. "Inequitable conduct" is a shorter but descriptively less helpful title for the defense formerly known as "fraud in the procurement of a federal trademark." Under the statute (15 U.S.C. § 1115(b)(1)) the fact that a trademark registration (or its incontestability) "was obtained fraudulently" is expressly made one of the defenses available to challenge an otherwise incontestable registered mark.

2. Because this Court set out the facts of the parties' dispute in detail in an earlier opinion (886 F.Supp. 1427, 1429–30 (N.D.Ill.1995)), only the facts relevant to the current issues will be rehashed here.

slatted design. Zip Dee was the only manufacturer of the slatted awnings through 1983, and of course it was necessarily the only manufacturer that "bright dipped" the awning cover and its arms to give the product a bright and shiny mirror-like finish.

Shortly after Zip Dee's patent expired in 1983, A & E Systems, Inc. ("A & E") began to produce slatted awnings with such a finish. In 1986 Zip Dee sued A & E in a California District Court, claiming that A & E had violated Zip Dee's patent and had also engaged in common law unfair competition by infringing on Zip Dee's trade dress. In April 1988 a jury verdict was returned in Zip Dee's favor on both its patent and trade dress claims, and the court entered judgment on the verdict. In addition the court enjoined A & E from further violating Zip Dee's trade dress.[3]

Dometic, which acquired A & E in 1988, understood that injunction to apply only to slatted awnings with a mirror-like finish, and so it began to produce slatted awnings with a dull (matte) finish. In May 1989 Zip Dee instituted a contempt proceeding against Dometic, asserting that the injunction applied to the overall form and shape of the awnings irrespective of the type of finish. However, the California District Court rejected that contention and ruled that the injunction was limited to the totality of Zip Dee's trade dress, expressly including the mirror-like finish.[4]

Denied that route for claiming an exclusive right in the slatted awning configuration, Zip Dee tried a different tack. On August 8, 1990 it filed an application with the United States Patent and Trademark Office ("Trademark Office") for a trademark for the "overall configuration of a slatted cover for an awning on a recreation vehicle." Dometic charges that Zip Dee engaged in inequitable conduct in several respects in the course of that application process.

On January 9, 1991 an examiner at the Trademark Office (the "Examiner") notified Zip Dee that its proposed trademark had been refused on alternative grounds: both "because the proposed mark appears to be functional" and "because the proposed mark is not inherently distinctive" (Zip Dee Ex. 1 at 1, 2). That was not a final refusal, for the Examiner asked Zip Dee to respond to a number of inquiries about the functionality of the slatted awning configuration (*id.* at 1):

> Applicant must state what advantage in protecting the awning or awning cover is gained by having the cover slatted.

> With respect to the design at issue, please state whether there are similar designs being marketed by others, whether applicant owns patent(s) on awning covers for RV's, and whether the design is less costly to make than others.

> Applicant must state whether its design is or has ever been at issue in infringement litigation.

Zip Dee responded with a July 9, 1991 amendment (Zip Dee Ex. 2) in which it addressed the Examiner's questions and provided attachments to support its contentions. Included in the amendment or as attachments were (1) an affidavit from Zip Dee's general manager and secretary Robert Miller ("Miller") regarding advertising and sales information for the slatted awning; (2) secondary meaning surveys conducted for use in the California trial; (3) Zip Dee's assertion that the California case had "resulted in a determination by the jury that the Zip Dee awning had achieved secondary meaning"; (4) brochures produced by Zip Dee, A & E and Carter[5] (a rival manufacturer), each showing an awning consisting of a single piece of flexible metal; (5) Zip Dee's assertion that "[t]he issue of functionality of the awning was addressed at trial and the jury found the awning was not functional"; (6) Zip Dee's statement "upon belief" that the slat-

---

**3.** All aspects of the decision were affirmed on appeal in an unpublished opinion, reported in table as *Zip Dee, Inc. v. A & E Sys., Inc.*, 891 F.2d 298, 1989 WL 133602 (Fed.Cir.1989).

**4.** That holding too was affirmed on appeal (*Zip Dee, Inc. v. A & E Sys., Inc.*, 1991 WL 80084 (Fed.Cir. May 17)).

**5.** At various places in the correspondence with the Examiner, Zip Dee mistakenly refers to Carter as "Carefree." That error has been corrected in the briefs by indicating "[sic Carter]" after each incorrect reference to Carefree. This opinion refers only to the correct name: Carter.

ted cover is more expensive to produce than a single sheet cover; and (7) Zip Dee's conclusory assertion that the "proposed mark is defacto functional and has acquired distinctiveness."

On August 23, 1991 the Examiner wrote Zip Dee that the secondary meaning surveys were not in the application file, asking that the surveys be resubmitted (Zip Dee Ex. 3). In addition the Examiner requested that Zip Dee (1) furnish "[a]ny written decision or other legal document in support of the non-functional nature of the applicant's mark" and (2) "state what advantage in protecting the awning or awning cover is gained by having the cover slanted [sic]." That second office action concluded by informing Zip Dee that "[t]he refusals of record are continued."

Zip Dee responded on February 24, 1992 (Zip Dee Ex. 4). As to the secondary meaning surveys, Zip Dee provided a copy of a mail room postcard showing that the Trademark Office had in fact received the surveys and said that the surveys submitted "may have been the last two surveys with original photographs in the applicant's possession." While stating that it would continue to search for other copies, Zip Dee encouraged the Trademark Office to continue to search for the surveys as well. Zip Dee also attached a copy of the original decision of the Court of Appeals for the Federal Circuit affirming the California District Court's decision on the patent and trade dress claims. Finally Zip Dee said:

> Evidence was adduced at trial that there were alternative commercial designs to the slatted construction for metal covers in recreational vehicle awnings which provided all the functional advantages that a slatted metal cover provides.

On May 5, 1992 the Examiner filed a "Trademark Interview and Amendment Record" summarizing a phone interview with Zip Dee's counsel (Zip Dee Ex. 5). In addition to noting technical changes, the Examiner reported:

Applicant claims that the mark has become distinctive of its goods, based on the sales and advertising figures of record.

Apparently no other communications took place until September 22, 1992, when the Examiner concluded that "[t]he mark of the application identified appears to be entitled to registration" and instructed that the mark be published in the Official Gazette (Zip Dee Ex. 5). When no opposition was raised, a trademark for the slatted awning configuration was registered on December 15, 1992. Zip Dee then launched this suit in May 1993, advancing (as the case went on) not only patent but also federal trademark and common law trademark claims.

### Positions of the Parties

AD 12 asserts that because Zip Dee engaged in inequitable conduct in obtaining its trademark on the slatted awning configuration, it should be barred from obtaining relief based on a violation of the trademark. Dometic identifies three areas in which Zip Dee allegedly made false representations to the Examiner:[6]

1. misrepresentations as to whether the slatted awning configuration was functional;

2. misrepresentations as to whether the slatted awning configuration had acquired secondary meaning; and

3. a misrepresentation in the application when Zip Dee attested that it believed that no other parties had the right to use the slatted configuration.

For its part, Zip Dee advances two arguments in support of its motion to strike AD 12. First it contends that most of the things claimed by Dometic were not misrepresentations at all. As a fallback position it argues that even if it loses on its first contention, any misrepresentations made to the Examiner were not material.

At this threshold pleading stage the sufficiency of AD 12 is evaluated as a matter of law. Although Zip Dee's motion is technically advanced as a motion to strike pursuant to

---

**6.** What follows are regroupings of the various specific allegations Dometic has made in its Fourth Amended Answer and its current Response Brief, which the Fourth Amended Answer incorporates by reference.

Rule 12(f), the applicable standard is the same as that used for considering a Rule 12(b)(6) motion to dismiss (*Instituto Nacional de Comercializacion Agricola v. Continental Ill. Nat'l Bank & Trust Co.*, 576 F.Supp. 985, 988 (N.D.Ill.1983)). Hence the test is whether, accepting all of Dometic's factual allegations as true and drawing all reasonable inferences in its favor, relief could be granted if Dometic were able to prove facts consistent with those allegations (*Hishon v. King & Spalding*, 467 U.S. 69, 73, 104 S.Ct. 2229, 2232, 81 L.Ed.2d 59 (1984)).

### Inequitable Conduct Defense

■ As Zip Dee repeatedly points out, it is relatively difficult to prove inequitable conduct in obtaining a trademark registration. That result flows conceptually from the notion that trademark rights exist "from the fact of use and the common law, independently of registration in the Patent Office" (*Morehouse Mfg. Corp. v. J. Strickland & Co.*, 407 F.2d 881, 888 (C.C.P.A.1969)). As *Morehouse, id.* went on to say:

It is in the public interest to *maintain* registrations of technically good trademarks on the register so long as they are still in use. The register then reflects the commercial reality. Assertions of "fraud" should be dealt with realistically, comprehending ... that trademark rights, unlike patent rights, continue notwithstanding cancellation of those additional rights which the Patent Office is empowered by statute to grant.

7. That burden is much heavier than the task of establishing inequitable conduct in obtaining a patent. Because the granting of a patent *creates* an exclusive right to make, use and sell the patented technology, it is in the public interest to require a higher burden of disclosure and a lower threshold for inequitable fraud (4 J. Thomas McCarthy, *McCarthy on Trademarks and Unfair Competition* ["McCarthy"] § 31.21[2][b][iii] (3d ed. 1995)).

8. Usually, in accordance with an analysis that—though drawn from tort law generally—appears to have originated for trademark purposes in the McCarthy treatise (now appearing at § 31.21[2][a]), the cases (see, e.g., *San Juan Prods., Inc. v. San Juan Pools of Kan., Inc.*, 849 F.2d 468, 473 (10th Cir.1988)) set out five re-

To rephrase that position, because it is in the public interest to keep valid trademarks on the register to protect the public from confusion, and because common law trademark rights exist with or without federal registration, a party alleging inequitable conduct must in effect prove that no trademark rights would exist had the applicant not fraudulently persuaded the Trademark Office to register the mark.[7]

■ That approach translates into three essential elements of an inequitable conduct defense:

 1. a false representation as to a material fact;

 2. the registrant's knowledge or belief that the representation is false; and

 3. the registrant's intention to induce action in reliance on the misrepresentation.[8]

In the context of a motion to strike, the most important of those requirements are a *false* statement of *material* fact.[9]

There is no universally accepted definition of what constitutes a "material fact" in the context of an inequitable conduct allegation, but courts facing the issue generally use some formulation of a "but-for" test. For example, *Citibank, N.A. v. Citibanc Group, Inc.*, 724 F.2d 1540, 1544 (11th Cir.1984) defined a material fact as one "that would have constituted grounds for denial of the registration had the truth been known." Earlier *Morehouse*, 407 F.2d at 886 had spoken of a fact that is "one vital to overcoming the ground of rejection." 4 McCarthy § 31.21[2][b][v] summarizes:

quirements for proving inequitable conduct—the three listed in the text plus (4) reasonable reliance on the misrepresentation and (5) damages proximately resulting from such reliance. There is no reason, however, why the final two requirements need to be included. As discussed later, the reliance requirement is subsumed by the test for materiality. And proof of damages flowing from the reliance is completely irrelevant to an inequitable conduct defense.

9. Zip Dee's knowledge or belief as to the truth or falsity of its representations and Zip Dee's intent when making those representations are questions of fact for the future. Dometic has sufficiently pleaded those matters, and that is all that is required at this point.

it is probably the law that ... a material misrepresentation arises only if the registration should not have issued if the truth were known to the examiner.

To paraphrase, the test is whether—considering all the evidence that was before him—the Examiner would still have allowed the registration if the misrepresentation was removed from the decision-making mix.

To apply that test in the circumstances of this case, it is necessary to understand what an examiner takes into consideration in evaluating whether a trademark for a product configuration should be granted. Before turning to the meat of Zip Dee's argument, then, it is useful to discuss briefly the legal requirements for such a registration.

 It is well settled that a merely functional product configuration cannot be registered (see, e.g., *Schwinn Bicycle Co. v. Ross Bicycles, Inc.,* 870 F.2d 1176, 1188 (7th Cir.1989)). Functionality of a configuration refers to "something that other producers of the product in question would have to have as part of the product in order to be able to compete effectively in the market" (*W.T. Rogers Co. v. Keene,* 778 F.2d 334, 346 (7th Cir.1985)). *W.T. Rogers, id.* at 339 provided an illustration:

> A firm that makes footballs could not use as its trademark the characteristic oval shape of the football, thereby forcing its rivals to find another shape for their footballs; since they wouldn't be able to sell any round or oblong or hexagonal footballs, that firm would have, not an identifying mark, but a product monopoly, and a product monopoly not under a term of years as under the patent laws but forever.

Because functional product configuration cannot be trademarked, functionality is a threshold inquiry for an examiner.

 If the examiner determines that a product configuration is nonfunctional, the applicant must still show that the proposed mark is either inherently distinctive or has acquired a secondary meaning. That latter concept refers to a "mental association in buyers' minds between the alleged mark and a single source of a product," even a single anonymous source (*Echo Travel, Inc. v.*

*Travel Assocs., Inc.,* 870 F.2d 1264, 1266–67 (7th Cir.1989)). If the examiner concludes that the product is nonfunctional and that the applicant has established the acquisition of a secondary meaning, the mark may then be registered.

*Claimed Misrepresentations: Functionality*

With the framework for analysis having been established, it is time to return to the two most critical elements of the inequitable conduct defense. For that purpose this opinion first looks at whether the statements made by Zip Dee to the Examiner were, as Dometic claims, "misrepresentations." If the answer is "yes" as to one or more of those statements, its or their materiality must then be considered.

1. *California Litigation*

 Dometic initially contends that Zip Dee made a false statement to the Examiner about the findings of the California jury on the issue of functionality of the slatted awning configuration. Specifically Dometic points to a statement made in Zip Dee's July 9, 1991 amendment response to the Examiner (Zip Dee Ex. 2 at 2):

> The issue of functionality of the awning was addressed at trial and the jury found that the Zip Dee awning was not functional. This issue was again raised on appeal to the Court of Appeals for the Federal Circuit, which affirmed the jury verdict.

Zip Dee's initial response (its Mem. 14–15) is that the California jury *did* find that the slatted awning configuration was nonfunctional, so that its statement was not false.

Little time need be spent on that issue, for just a few months ago this Court considered the matter at length and ruled that the California litigation had involved the slatted configuration only *in conjunction with* the bright mirror-like finish (886 F.Supp. at 1437–41). In fact, at the time of this Court's earlier opinion Zip Dee urged vehemently that the slatted awning configuration was *not* litigated in the California case, so that neither claim nor issue preclusion principles should keep Zip Dee from bringing claims as to the slatted awning configuration in this

case. After conducting an exhaustive review of the trial record, this Court concluded (*id.* at 1437):

> Nowhere in the record of that [California] litigation does Zip Dee assert rights in the slatted design *alone*.

There is no reason to revisit the question—clearly Zip Dee's statement to the Examiner was a misrepresentation.

### 2. *Examiner's Request as to Similar Designs*

■ Next Dometic points to Zip Dee's response to this request in the Examiner's January 9, 1991 office action (Zip Dee Ex. 1 at 1):

> With respect to the design at issue, please state whether there are similar designs being marketed by others....

Dometic alleges that Zip Dee acted fraudulently when it then gave the Examiner a brochure by a rival manufacturer, Carter, that shows an alternative awning design, but did not submit information about an awning made by Carter that was "substantially identical" to the configuration that Zip Dee was attempting to register.

■ As an argument regarding misrepresentation on the question of functionality,[10] Dometic's position makes little sense. As Zip Dee points out, in asserting nonfunctionality an applicant need not claim that its design is unique—instead the applicant must convince the Examiner that *other* designs are available to competitors. It is therefore irrelevant to the issue of functionality that Zip Dee did not provide the Examiner with information about Carter's "substantially identical" design. Zip Dee complied with the request when it provided information about Carter's alternative design, and its omission of Carter's substantially identical design did not amount to a "false statement."

### 3. *Examiner's Request as to Other Patents*

■ Finally on the functionality issue, Dometic argues that Zip Dee was not forthright in responding to another request in the

Examiner's January 9, 1991 office action (Zip Dee Ex. 1 at 1):

> With respect to the design at issue, please state ... whether applicant owns patent(s) on awning covers for RV's.

On that score Dometic identifies three undisclosed Zip Dee patents: Patent No. 4,576,192 (the "awning assembly" patent), Patent No. 4,634,172 and Patent No. 4,195,877. Zip Dee retorts that because the disclosures of the slatted awning configuration in the other patents were only incidental, those other patents were not relevant, so that its nondisclosure did not equate to a misrepresentation.

■ Evaluation of Zip Dee's position begins with the recognition that the disclosure of a product configuration within a utility patent *may be* relevant in determining whether the configuration is functional (*In re Bose Corp.*, 772 F.2d 866, 872 (Fed.Cir. 1985)). Whether the disclosure is *actually* relevant turns on whether the product configuration appears in the patent only incidentally, or whether instead its functionality is revealed by the patent. And that inquiry obviously demands an examination of the patent (1 McCarthy § 6.03[4] ).

Zip Dee R. Mem. 7 urges (in speaking of the awning assembly patent) that the slatted awning configuration appears as part of the patent only incidentally, "just as a patent for a picture frame would make reference to a painting." Zip Dee claims that the awning assembly patent is designed to work with all awnings, with the slatted covers being just one of the types.

This opinion has already said that on the current motion this Court must draw reasonable factual inferences in favor of nonmovant Dometic. At this stage this Court cannot accept Zip Dee's contention that the slatted configuration was so clearly an incidental inclusion as a matter of law that it need not have been disclosed to the Examiner. Each of the other three patents makes some reference to a slatted awning cover, and the import of those references cannot now be decided on the pleadings alone. Dometic has alleged that Zip Dee should have disclosed the

---

10. Because Dometic does not seek to relate this omission to the issue of secondary meaning (understandably so, for it appears that the Examin-
er's inquiry was not directed to that issue), the text discussion focuses only on functionality.

existence of the other patents, and it has legal authority to back it up.

In sum, for the present it must be accepted that Zip Dee should have disclosed the existence of the other patents. And that being so, it follows (again for the present) that Zip Dee made a "false statement" when it said nothing about its ownership of those patents.

### Materiality of the Misrepresentations: Functionality

■ This opinion turns then to Zip Dee's fallback position: Even if it considered at this stage that false representations were made to the Examiner as to functionality, the misrepresentations were not material because there was sufficient alternative evidence to convince the Examiner that the product configuration was nonfunctional. Again the test is the sort of "but-for" standard described earlier.

One thing is plain: At some point between January 9, 1991 (when the Examiner initially rejected the application because "the proposed mark appears to be functional") and September 22, 1992 (when he ultimately concluded that "the mark of the application identified appears to be entitled to registration") *something* convinced the Examiner that the slatted awning configuration was nonfunctional. On the current record, three strands of information relevant to functionality were before the Examiner during that period: (1) Zip Dee's assertion that the California litigation had settled the issue of the functionality of the awning configuration, (2) evidence of at least one design alternative to Zip Dee's and (3) Zip Dee's effective representation (by remaining silent in the face of the Examiner's request) that it owned no other awning patents for RV's "with respect to the design at issue." Zip Dee's statement about the effect of the California litigation was false, and its representation that it owned no other relevant patents is viewed as false for purposes of this motion. On the other hand, Zip Dee's disclosure of Carter's alternative design was accurate.

As Zip Dee would have it, the existence of the Carter design was alone enough to convince the Examiner that the awning configu-

ration was nonfunctional. Not so on this motion to dismiss—while the burden on a party pleading an inequitable conduct defense is high, it is not insurmountable. It cannot be said here that "it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations" (*Hishon,* 467 U.S. at 73, 104 S.Ct. at 2232).

In short, Dometic must be allowed the opportunity to produce facts showing that Zip Dee's misrepresentation about the California decision and its failure to disclose the existence of the other patents caused the Examiner to make a decision about functionality that he would not otherwise have made. Zip Dee's motion to strike on that ground is denied.

### Claimed Misrepresentations: Secondary Meaning

Dometic also says that Zip Dee engaged in inequitable conduct in its attempt to convince the Examiner that the awning configuration had acquired secondary meaning. Again Dometic makes three claims:

1. Zip Dee misled the Examiner when it stated that "the jury trial in [the California] case resulted in a determination by the jury that the Zip Dee awning had achieved secondary meaning."

2. Zip Dee misrepresented the scope of the secondary meaning surveys submitted to (and later lost by) the Trademark Office.

3. Zip Dee acted fraudulently in refusing to provide another set of copies of the surveys after the Trademark Office misplaced the first set.

Zip Dee's argument in support of its motion to dismiss here, like its argument on the functionality issue, is two-pronged. Again its first contention is that some of the statements were not misrepresentations. This time its fallback position is that even if misrepresentations were made, there were alternative grounds that would have supported a finding of secondary meaning. As before, this opinion first considers whether any misrepresentations were made before it turns to materiality.

## 1. California Litigation

■ This time Dometic focuses on another statement in Zip Dee's July 9, 1991 amendment responding to the Examiner's first office action (Zip Dee Ex. 2 at 2):

A jury trial in [the California] case resulted in a determination that the Zip Dee awning had achieved secondary meaning. . . .

As this Court has said both in its earlier opinion and here, the California litigation dealt with the slatted awning configuration in its then-existing embodiment, including its bright and shiny mirror-like finish. Zip Dee's assertion was therefore a misrepresentation.

## 2. Scope of the "Lost" Surveys

It is likewise clear that Zip Dee misled the Examiner when it stated in its February 24, 1992 letter (Zip Dee Ex. 4 at 3) that "the applicant has previously submitted surveys which establish secondary meaning of the mark sought to be registered and has submitted a Federal Court of Appeals decision affirming the jury verdict on that issue. . . ." Indeed, Zip Dee's counsel admitted in a deposition (Dometic Ex. 10 at 105–06), and Zip Dee concedes in its R.Mem. 11, that the quoted language was a misstatement. To be specific, the statement misrepresents that the Court of Appeals for the Federal Circuit affirmed the trial jury's finding that the surveys established secondary meaning in the slatted configuration alone, not the configuration in conjunction with its bright and shiny finish.

## 3. Failure To Resubmit Surveys

■ Dometic also claims that Zip Dee "misled" the Examiner by failing to resubmit the secondary meaning surveys after the first set of surveys was misplaced by the Trademark Office. According to Dometic, Zip Dee's February 24, 1992 statement that it could not resubmit the surveys because they "may have been the last two surveys with original photographs in the applicant's possession" (Zip Dee Ex. 4 at 2) clashes with a later admission that Zip Dee's counsel had "photographic copies of the surveys" (Dometic Ex. 12 at 99). Dometic concludes that if the surveys had been resubmitted as requested by the Examiner, the Examiner would have seen that the surveys concerned the slatted awning in conjunction with the bright and shiny mirror-like finish, not the overall awning configuration sought to be trademarked.

That argument has no relevance on the inequitable conduct issue. Here the situation contrasts with the Examiner's request for information about other patents, where Zip Dee may have misled the Examiner by silence in the face of that request. In this instance Zip Dee advised the Examiner that it had already provided one set of the surveys and did not think it would be able to provide another set (Zip Dee Ex. 4 at 1–2). In no way was the Examiner "misled" by that response—he simply chose to go on and make a decision without the surveys before him. Zip Dee's failure to resubmit the surveys was not a misrepresentation.

## Materiality of the Misrepresentations: Secondary Meaning

■ Zip Dee's second-line argument in support of this aspect of its motion to strike is that the Examiner had substantial evidence other than the misrepresented matters before him that supported a finding of secondary meaning. Zip Dee Mem. 16 and R.Mem. 9–13 refer (1) to an affidavit submitted by Zip Dee's Miller, (2) to Zip Dee's proof of its longevity of use and (3) to an alleged finding of "slavish copying" by Dometic and its predecessor A & E as ample evidence to support the finding of secondary meaning notwithstanding the misrepresentations. Although the question here is closer than in the earlier discussion as to functionality, this Court cannot hold as a matter of law that there is no set of facts that Dometic could prove to support its claim.

Many types of evidence may bear on the question whether a mark has acquired secondary meaning: Prime examples of such evidence cover direct consumer testimony; consumer surveys; exclusivity, length and manner of use; amount and manner of advertising; amount of sales and number of customers; established place in the market; and proof of intentional copying (*Echo Trav-*

*el,* 870 F.2d at 1267). To prove that secondary meaning existed, Zip Dee had to show that the primary significance of the slatted configuration is to identify the slatted configuration with Zip Dee (*Thomas & Betts Corp. v. Panduit Corp.,* 65 F.3d 654, 660 (7th Cir. Sept. 14)).[11] Zip Dee placed before the Examiner evidence (including some misrepresentations) in five of the above-listed categories. Again the mode of analysis is to consider all the information before the Examiner to determine whether the Examiner would have registered the mark if the misrepresentations had been removed.

Solely as a matter of convenience, and not in an attempt to set out the evidence in any order of its significance, the material before the Examiner will be described starting at the beginning of the *Echo Travel* list. First was Zip Dee's misrepresentation in its February 24, 1992 letter that the secondary meaning surveys had been found by the California jury to show acquired secondary meaning and that the Court of Appeals had affirmed that decision (Zip Dee Ex. 4 at 3). Next the Miller affidavit provided evidence that Zip Dee had used the slatted configuration continually since 1969, had sold some $50 million worth of goods utilizing the slatted cover between 1969 and 1991 and had spent some $2.5 million in advertising the slatted configuration between 1969 and 1991 (Zip Dee Ex. 2 attachment). Finally, Zip Dee falsely asserted that the California jury had returned a finding of "slavish copying" (see Zip Dee R.Mem. 10).[12]

Once again the Examiner had before him a mixture of truths and misrepresentations. Zip Dee maintains that the evidence in the Miller affidavit, standing alone, was enough to support a finding of secondary meaning under Lanham Act § 2(f) ("Section 2(f)," 15 U.S.C. § 1052(f)). But while Section 2(f) does provide that the Commissioner (for whom the Examiner acts) "may accept as prima facie evidence that the mark has become distinctive ... proof of substantially exclusive and continuous use thereof as a mark by the applicant in commerce for the five years next preceding the date on which the claim of distinctiveness is made," there is no magic in the five-year mark. Instead "[i]t merely authorizes the Trademark Office, in its discretion, to accept such proof" (2 McCarthy § 15.22[1][b] and cases cited there). Similarly, evidence of sales and advertising are probative but not dispositive. In each case the applicant asks the Examiner to infer that because millions of dollars of the product configuration have been sold or millions of dollars have been spent on advertising, the public must therefore identify the product configuration with the advertiser. But the test of secondary meaning is the success rather than the mere fact of advertising. Hence while such circumstantial evidence could form the basis of a finding of secondary meaning, it does not *necessarily* do so (see *Echo Travel,* 870 F.2d at 1269–70).[13]

Once again this Court emerges with the same conclusion that it reached in the func-

---

**11.** Although this opinion is not the place to reexamine the issue of trade dress, the parties should look at this month's opinion of our Court of Appeals in *Thomas & Betts* to consider its possible impact on that aspect of this case.

**12.** This point deserves some discussion. This Court has found no reference to "slavish copying" anywhere in the correspondence between Zip Dee and the Examiner. Of course the Examiner could have inferred as much from Zip Dee's repeated reference to the "fact" that the California jury had found for Zip Dee (and against A & E) on the trade dress and patent claims in the previous suit. But that really cuts against Zip Dee's claim, because the California jury found that the A & E slatted configuration with a mirror-like finish had copied Zip Dee's product of the same type, not just the slatted configuration that Zip Dee was later seeking to register. In-

deed, any evidence of "slavish copying" that came from Zip Dee's assertions about the California jury verdict were misrepresentations that could only have led the Examiner to make an ill-founded determination about secondary meaning.

**13.** Zip Dee makes too much of the fact that the Examiner, in the May 4, 1992 "Trademark Interview Amendment Record," wrote an examiner's amendment that read, "Applicant claims that the mark has become distinctive of its goods, based on the sales and advertising figures of record" (Zip Dee Ex. 5). Certainly that cannot be read, as Zip Dee would have it, as dispositive evidence that the Examiner based his secondary meaning decision solely on the sales and advertising figures. As the text reflects, the materiality analysis must consider all the evidence that was before the Examiner.

tionality decision. With a mixture of truths and misrepresentations before the Examiner, and with no single piece of evidence serving as a knock-down winner when it comes to showing acquired secondary meaning, it cannot be said that Dometic could prove no set of facts that would support its allegations.

### Claimed Fraud in Signing the Oath

■ Dometic's final charge of inequitable conduct is that Zip Dee defrauded the Trademark Office when it attested in its application that it "believes [Zip Dee] to be the owner of the mark sought to be registered; that to the best of ... [its] knowledge and belief, no other person, firm, corporation or association has the right to use said mark in commerce...." Dometic argues (1) that Zip Dee made that statement when it knew that A & E had been using the proposed mark since the commencement of the California litigation and (2) that the California judge's decision not to hold Dometic in contempt for manufacturing slatted awnings with a non-shiny finish indicates that Dometic had a right to use the mark. Zip Dee counters—and Dometic does not respond—by saying (1) that the use of the mark by another, especially when the applicant believes the other is an infringer, is not at odds with the oath and (2) that the California court's contempt proceeding ruled only on the question whether Dometic had violated the injunction.

Fraud in the oath is a popular but seldom successful claim against the registration of a trademark (4 McCarthy § 31.21[3][d]). Both literally and as a matter of interpretation the oath calls for the applicant to testify to a subjective belief that no one has the legal right to the mark, *not* that no one else is using it (*id.* and cases cited there). Dometic's first argument, then, falls away. Just because Dometic was using the slatted configuration—and from Zip Dee's perspective was engaging in illegal behavior in doing so—does not make the statement false.

Second, as has been said again and again, the California litigation did not provide a ruling on anyone's legal right to use the slatted configuration *apart from* the bright and shiny mirror-like finish. In the contempt hearing the California court did not

establish that Dometic had a legal right to use the slatted awning configuration so long as it had a flat finish, but rather that Domestic's manufacture of the slatted awning with a flat finish did not violate the injunction. Thus the legal right to use the slatted awning configuration had not been determined when Zip Dee signed the oath. It follows that Zip Dee did not make a misrepresentation in the oath.

### Conclusion

Zip Dee's motion to strike AD 12 is denied as to most (though not all) of Dometic's assertions of inequitable conduct in relation to the Examiner's findings of functionality and secondary meaning. Zip Dee's motion to strike is granted as to Dometic's allegation of Zip Dee's inequitable conduct in signing the oath.