**BISHOPS BAY FOUNDERS GROUP, INC., Plaintiff,**

v.

**BISHOPS BAY APARTMENTS, LLC, Defendant.**

No. 02–C–0584–C.

United States District Court, W.D. Wisconsin.

Feb. 11, 2003.

Kenneth B. Axe, Madison, WI, for Plaintiff.

Steven C. Underwood, Neider & Boucher, S.C., Madison, WI, for Defendant.

## OPINION AND ORDER

CRABB, District Judge.

This is a civil action for injunctive and monetary relief in which plaintiff alleges that defendant's use of the mark "Bishops Bay" constitutes trademark infringement and unfair competition under the Lanham Act, 15 U.S.C. § 1125(a), and Wis. Stat. § 132.033, and a false representation under Wis. Stat. § 100.18.

This case is before the court on plaintiff's motion for a preliminary injunction for alleged Lanham Act violations. Because plaintiff has demonstrated that (1) it has more than a negligible chance of success on the merits of its Lanham Act claim; (2) it has and will continue to suffer irreparable injury for which there is no adequate remedy at law; (3) the harm it will suffer without an injunction outweighs the harm defendant will suffer with an injunction; and (4) it is in the public interest to avoid potential confusion, I will grant plaintiff's motion.

Defendant has filed a motion to strike a letter that plaintiff attached to its complaint, *see* Cpt., dkt. # 2, Exh. F, arguing that the letter is redundant and immaterial under Fed.R.Civ.P. 12(f) and inadmissible as an offer to compromise under Fed.R.Evid. 408. The letter provides in part

that plaintiff's president "is not interested in discussing any license of the Bishops Bay tradename" with defendant. Plaintiff argues that it provided the letter to demonstrate that it continues to assert a proprietary interest in the Bishops Bay mark and that it has not acquiesced in defendant's use of the mark. Because defendant has not shown that the material is either redundant or immaterial, I will deny the Rule 12(f) motion to strike. As to the Rule 408 argument, defendant may renew its objection if and when plaintiff attempts to use the letter as evidence.

From the parties' stipulated facts and the record, I find the following facts material and undisputed for the sole purpose of deciding the present motion.

## UNDISPUTED FACTS

Sam Jacobsen is president and sole shareholder of plaintiff Bishops Bay Founders Group, Inc. In 1985, Jacobsen began purchasing land on Lake Mendota in order to develop a private country club and housing development that would include condominiums and single-family residences. Jacobsen purchased the land and a home that had belonged to the bishop from the Catholic Diocese of Madison. The bishop's home was to serve as the clubhouse for the country club. In April 1993, Jacobsen incorporated plaintiff as a real estate development and brokerage services firm. That same year, plaintiff obtained a construction loan to build the country club.

Plaintiff developed the single-family residences known as "Residences of Bishops Bay." Of the 56 residential lots developed, two remain to be sold by plaintiff. R & R Development Group LLC developed the condominiums known as "Bishops Bay Condominiums" and "Villages of Bishops Bay." Richard Harper is one of two members of R & R Development. Neither Jacobsen nor plaintiff has ever been a member of R & R Development. The combination of residences and condominiums is known as the "Bishops Bay Community."

On November 11, 1994, Jacobsen personally licensed the Bishops Bay mark to R & R Development in writing. Plaintiff was not a party to this licensing agreement. The licensing agreement provides that Jacobsen has exclusive right, title and interest in the Bishops Bay mark. Plaintiff has produced no documents showing that it was either an assignee or assignor of the Bishops Bay mark. Use of the Bishops Bay name added value to the R & R condominiums and factored into the amount of consideration R & R opted to pay for purchasing the land. Without the license, R & R Development would not have purchased the land to develop the condominiums. According to Harper, R & R Development could charge more for the condominiums by using the name Bishops Bay. R & R Development spent substantial sums advertising and promoting the condominiums.

On an unspecified date, Bishops Bay Country Club, Inc. bought the country club property. (It is unclear whether Jacobsen or plaintiff sold the property to this entity.) Neither plaintiff nor Jacobsen has an interest in Bishops Bay County Club, Inc. and plaintiff has never been in the golf course services business. The country club opened in 1995 as a private, members-only club. It includes an 18–hole golf course, pool, tennis pavilion, pro shops, clubhouse and dining room. For the years 2000 and 2001, the advertising costs for the country club exceeded $24,000.

On April 13, 2002, Jacobsen personally entered into an offer to sell property to D & R Development Corp. Plaintiff was not a party to the offer. The offer provides that Jacobsen licenses the use of "Bishops Bay" to D & R Development for D & R's use in marketing and developing "Jacobsen" property and other properties described in

the "Armstrong Agreement and the Paulson Option."

Although plaintiff asserts that it has licensed the mark "Bishops Bay," it does not have a written license supporting that assertion. (Jacobsen, not plaintiff, entered the license with R & R Development and D & R Development.) There are no documents showing that plaintiff is either an assignee or assignor of the Bishops Bay mark.

According to Jacobsen, he coined the name "Bishops Bay" in 1993 and, before that time, the area adjacent to the lake had no name. Jacobsen acknowledged that Harper could have told him that the area was known as "Holy Water Bay." Since childhood, Harper has known that area of the lake as Holy Water Bay. A 1991 Rand McNally map of Madison and the surrounding areas designates that area of the lake as "Bishop's Bay."

Plaintiff first used the Bishops Bay mark in commerce as early as December 1993 in an advertisement in *Madison Magazine*. Plaintiff offered a "limited number of premier homesites overlooking Bishops Bay Country Club Golf Course."

On January 4, 1995, plaintiff registered the "Bishops Bay" mark in its own name with the State of Wisconsin. (Neither plaintiff nor Jacobsen has registered the mark with the U.S. Patent and Trademark Office.) On the Wisconsin registration form, plaintiff stated that it first used the mark in June 1993. The registration certificate provides that plaintiff filed for a mark "consisting of the words 'Bishops Bay'; as pertains to real estate development services, real estate brokerage services, [and] country club (golf course) services."

From December 1993 to the present, the name Bishops Bay has been associated in commerce with Bishops Bay Country Club. From 1995 to present, the name Bishops Bay has been associated in commerce with the Villages of Bishops Bay and the Bishops Bay Community. The Bishops Bay Community has developed a reputation for being an exclusive, restricted luxury community with the highest level of amenities.

Plaintiff's costs to acquire and develop the residential and condominium lots and the golf course were approximately $21,250,000. The residential lot prices ranged from $150,000 to $325,000. The 2001 assessed values of the residences ranged from $405,700 to $1,166,300. The condominiums' 2001 assessments ranged from $283,200 to $545,900. The 2002 assessed value of the country club is $4,224,300. Contiguous to the golf course and north of the Bishops Bay Community, plaintiff is developing 450 acres of land known as the "Highlands of Bishops Bay."

Defendant's apartment complex is located directly adjacent to the Bishops Bay Community. Defendant purchased the apartment complex on February 22, 2002. The apartment complex was built in 1970 and has 464 units with rents ranging from $495 to $700 a month. In the spring of 2002, defendant changed the name of its apartment complex from "Willows" and "Century Hollow" to "Bishops Bay Apartments." Defendant was aware of the Bishops Bay Country Club, Villages of Bishops Bay and Residences of Bishops Bay before it changed the name of the complex. The complex is not located on Lake Mendota. Before the spring of 2002, defendant never used the name Bishops Bay. Plaintiff has not given defendant permission to use the name Bishops Bay. On the basis of the amenities offered, the apartment complex would not be considered on a par with the Bishops Bay Community in terms of luxury.

## OPINION

### A. *Subject Matter Jurisdiction*

■ Because the parties ignored the issue of jurisdiction in their briefs, at the

preliminary injunction hearing I asked whether it had used the Bishops Bay mark in interstate commerce sufficient to confer subject matter jurisdiction under the Lanham Act. In response to this question, Jacobsen filed an affidavit in which he avers that plaintiff (1) used out-of-state materials to build the golf course, homes and condominiums; (2) hired out-of-state experts to design and construct the golf course; and (3) advertised in *Madison Magazine,* which has out-of-state subscribers. In addition, the record shows that 12 individuals moved into the Bishops Bay Community from out-of-state. Accordingly, plaintiff has established that, at minimum, its use of the mark has affected interstate commerce. This is sufficient to confer jurisdiction. *See Daniel v. Paul,* 395 U.S. 298, 89 S.Ct. 1697, 23 L.Ed.2d 318 (1969) (receiving out-of-state materials); *Bonaventure Associates v. Westin Hotel Company,* 1983 WL 51970, 218 U.S.P.Q. 537 (Trademark Tr. & App. Bd.1983) (out-of-state advertising); *Demetriades v. Kaufmann,* 698 F.Supp. 521 (S.D.N.Y. 1988) (same).

### B. *Preliminary Injunction*

■ In order to succeed on a motion for a preliminary injunction, the moving party must show (1) more than a negligible chance of success on the merits and (2) no adequate legal remedy and irreparable harm if preliminary relief is denied. Once the moving party does this, the district court must consider (3) the balance of hardships between the plaintiffs and the defendants, adjusting the hardships for the probability of success on the merits, and (4) the public interest. *See Abbott Laboratories v. Mead Johnson & Co.,* 971 F.2d 6, 11–12 (7th Cir.1992); *see also Planned Parenthood v. Doyle,* 162 F.3d 463, 473 (7th Cir.1998).

### 1. *Success on the merits*

■ A plaintiff may bring a claim for infringement of an unregistered mark under § 43(a) of the Lanham Act, 15 U.S.C. § 1125(a). *See Zazu Designs v. L'Oreal, S.A.,* 979 F.2d 499, 502 (7th Cir.1992). To prevail on such a claim, a plaintiff must show both that the mark is protected and that it has been infringed. *See Platinum Home Mortgage Corp. v. Platinum Financial Group, Inc.,* 149 F.3d 722, 726 (7th Cir.1998); *Echo Travel, Inc. v. Travel Associates, Inc.,* 870 F.2d 1264, 1266 (7th Cir.1989). In determining infringement, a court asks "whether the actions of a subsequent user of a substantially similar or identical mark causes a likelihood of confusion among consumers as to the source of those specific goods or services." *Platinum Home,* 149 F.3d at 726. When, as in this case, a mark has not been registered with the U.S. Patent and Trademark Office the burden is on the plaintiff to establish that it is entitled to protection under the Lanham Act. *Id.* at 727; *see also* 2 *McCarthy on Trademarks* § 15:32.

### a. Type of mark

■■ Marks are classified into five categories of increasing distinctiveness: (1) generic; (2) descriptive; (3) suggestive; (4) arbitrary; and (5) fanciful. *See Two Pesos, Inc. v. Taco Cabana, Inc.,* 505 U.S. 763, 768, 112 S.Ct. 2753, 120 L.Ed.2d 615 (1992). Terms that fall into the last three categories are inherently distinctive. Thus, they require no addition showing to be protected. *Id.; see also Blau Plumbing, Inc. v. S.O.S. Fix-It, Inc.,* 781 F.2d 604, 609 (7th Cir.1986) ("Business Week" and "Coppertone" are suggestive, "Black & White" scotch is arbitrary, and "Exxon" and "Kodak" are fanciful). Conversely, generic terms such as "film" and "airplane," which are commonly used to designate a type of product. Thus, they are

never distinct and never protected. *Two Pesos,* 505 U.S. at 768, 112 S.Ct. 2753. Descriptive terms, such as "bubbly" champagne, fall in the middle of the trademark spectrum. Such terms are protected only if they have acquired distinctiveness, or "secondary meaning," in their relevant market. *See Blau Plumbing,* 781 F.2d at 609 ("Holiday Inn" is descriptive term that has acquired secondary meaning). Secondary meaning exists when consumers think of the term not as a description but as the name of the product or service itself. *See id.; see also Mil–Mar Shoe Company, Inc. v. Shonac Corporation,* 75 F.3d 1153, 1156–57 (7th Cir.1996). Geographically descriptive marks generally fall into the descriptive category. *See 2 McCarthy on Trademarks and Unfair Competition* § 14:1; *see also In re Nantucket, Inc.,* 677 F.2d 95, 99 (Cust. & Pat. App.1982). To be protected under the Lanham Act, a geographically descriptive mark must have acquired secondary meaning. *Id.* at § 14:9.

In its pre-hearing briefs, plaintiff alleged that in 1993, Jacobsen coined the name "Bishops Bay" and that before he did so the area of Lake Mendota in question had no name. (In fact, Jacobsen testified in his deposition both that the bay had no name and that he "could" have known it as "Holy Water Bay.") From this, plaintiff argued that the Bishops Bay mark was arbitrary and, thus, inherently distinctive. Although defendant argued vigorously that the area is geographically descriptive, it had no evidence to support this assertion other than its own speculation. However, after both parties had filed their briefs and just before the hearing, defendant discovered a 1991 Rand McNally map of Madison in which that area of the lake is designated "Bishop's Bay." As is evident, the map pre-dates Jacobsen's alleged naming by two years.

Plaintiff argues that even though Bishops Bay is designated on the map, it is not geographically descriptive. In support of its contention, plaintiff cites several cases, including *Pebble Beach Co. v. Tour 18 I. Ltd.,* 942 F.Supp. 1513 (S.D.Tex.1996), *aff'd as modified,* 155 F.3d 526 (5th Cir. 1998), and *Horseshoe Bay Resort Sales Co. v. Lake Lyndon B. Johnson Improvement Corp.,* 53 S.W.3d 799 (Tex.App.—Austin 2001). However, in these cases, the developer selected an arbitrary mark that *later* became known geographically. *Pebble Beach,* 942 F.Supp. at 1538 ("any geographic connotation ... has developed over time ... and is directly attributable to the growth and success of the development itself"); *Horseshoe Bay,* 53 S.W.3d at 808 ("mark was arbitrary and not geographically descriptive *when coined* by the plaintiffs") (emphasis in original). "Where a developer chooses an arbitrary mark to designate a development, the mark is protected despite the geographic aspects of the development." *Pebble Beach,* 942 F.Supp. at 1538 (citing *Prestwick, Inc. v. Don Kelly Bldg. Co.,* 302 F.Supp. 1121, 1124 (D.Md.1969) (mark "Tantallon" when used for planned community was not geographically descriptive because it had "no generally known geographic significance" and no general geographic name before area was developed)). In this case, unlike *Pebble Beach* and *Horseshoe Bay,* there is evidence that the area of the lake in question was known as Bishops Bay at least two years *before* Jacobsen allegedly coined the name. Without doubt, defendant's discovery of the Rand McNally map changes the contours of this case.

Plaintiff attempts to minimize the map's negative effect, arguing that "[t]he existence of one map, however, does not prove that the name was descriptive of a specific area at the time" and that "[n]o evidence was presented that the name was known by the public, as opposed to one that was

simply chosen by the cartographer or publisher of the map." Plt.'s Surrebuttal, dkt. # 57, at 2. However, plaintiff's stance presupposes that *defendant* has the burden of proving that the area was known as Bishops Bay. This is incorrect. As stated earlier, because the Bishops Bay mark is unregistered, *plaintiff* has the burden of proving that it is entitled to Lanham Act protection, not vice versa. *See Platinum Home*, 149 F.3d at 726. If plaintiff wishes to pursue this argument at trial or in a motion for summary judgment, it will have to provide something more persuasive than speculation as to cartographic serendipity. Simply put, the Rand McNally map is strong evidence of prior geographical descriptiveness.

b. Secondary meaning

■ All is not lost for plaintiff because a geographically descriptive mark may still be protected under the Lanham Act if plaintiff can prove the mark has acquired "secondary meaning." *See 2 McCarthy on Trademarks* § 14:9 ("Since geographically descriptive terms are not regarded as inherently distinctive, the law requires that they must acquire consumer association or 'secondary meaning' for legal protection.") (collecting cases); *see also Boston Beer Co. v. Slesar Bros. Brewing Co., Inc.*, 9 F.3d 175, 180 (1st Cir.1993) ("a geographical term ... can be protected ... only if it has acquired 'secondary meaning' "). Secondary meaning is the "mental association in buyers' minds between the alleged mark and a single source of the product [or service]." *Spraying Systems, Co. v. Delavan, Inc.*, 975 F.2d 387, 393 (7th Cir.1992) (citing 1 *McCarthy on Trademark* § 15:2).

Plaintiff argues first that defendant has conceded that plaintiff's use of the Bishops Bay mark has achieved secondary meaning. Specifically, plaintiff points to a number of facts to which defendant stipulated such as, "In Harper's mind, the public would have associated the name Bishops Bay with the developer of the area whether or not it knew the developer's name or identity" and plaintiff argues that Harper has "testified as to the perception of consumers, to which the parties have stipulated." Plt.'s Surrebuttal, dkt. # 57, at 6. Although this is an interesting spin on the stipulated facts, it is not persuasive. First, the fact that defendant agrees that Harper believes something does not mean that defendant also agrees with the underlying proposition. Even if plaintiff had proposed this as a fact, defendant could not have disputed it. It is impossible for anyone to refute what another person thinks or believes.

Second, Harper's belief as to consumer perception does not equal consumer perception, just as Harper's belief that the world is flat would not make the world flat. It simply means that is what Harper *believes*. Third, Harper's affidavit does not establish consumer perception; he is a member of R & R Development, which holds a license to the mark and developed the condominiums. Thus, he has an interest in insuring that the mark does not fall into the public domain. For similar reasons, Harper's testimony does not qualify as consumer testimony. In fact, plaintiff acknowledges that it has not submitted any consumer testimony but contends that such testimony is not necessary at this stage of the proceedings. *Id.* at 6–7. Plaintiff is correct as a technical matter. However, as the party moving for a preliminary injunction, plaintiff has the burden of showing that it has more than a negligible chance of success of proving that its mark is valid, which, in turn, requires a showing that it has a more than negligible chance of success of proving secondary meaning because the mark is geographically descriptive. Because consumer testimony is one of the factors a court considers in determining whether a mark has achieved secondary meaning, consumer testimony

would be helpful, albeit not absolutely necessary, in determining whether to grant plaintiff's preliminary injunction.

■ In any event, plaintiff argues that the Bishops Bay mark has achieved secondary meaning. The Court of Appeals for the Seventh Circuit considers the following seven factors in determining whether a mark has achieved secondary meaning: (1) direct consumer testimony; (2) consumer surveys; (3) exclusivity, length and manner of use; (4) amount and manner of advertising; (5) amount of sales and number of customers; (6) established place in the market; and (7) proof of intentional copying. *Echo Travel*, 870 F.2d at 1267. The first two factors are direct evidence of secondary meaning; the remaining factors are circumstantial. *Id.* The existence of secondary meaning is a question of fact. *See* 2 *McCarthy on Trademark* § 15:29 (collecting cases).

(i) exclusivity, length and manner of use

Plaintiff argues that it has used the Bishops Bay mark continuously and exclusively for nine years. As I noted during the hearing, plaintiff failed to explain in its pre-hearing briefs how Bishops Bay Country Club, Inc. fits into the picture as a "licensee." In response to these concerns, plaintiff submitted a third affidavit in which Jacobsen averred that because he financed Bishops Bay Country Club's purchase of the country club (approximately $7.5 million), he has been given power to control the club until (1) it reaches 300 members and (2) the country club is able to refinance and buy him out. The country club by-laws provide that until these two conditions are met, Jacobsen (and two other persons chosen by him) shall be appointed to the board of directors. The by-laws may not be changed without Jacobsen's written consent. Jacobsen must approve any recommendations on major financial or policy matters, including the budget, before the board of directors takes final action. Prospective country club members must accept the club's membership plan before they join. The plan provides that the activities and operations of the country club are subject to the terms of a management agreement with Bishops Bay Management Co. Inc., which is owned by Jacobsen. The country club has not reached 300 members. Defendant does not contest these averments. In addition, plaintiff cites several cases in his post-hearing brief that support Lanham Act protection in the case of an implied license, including *University Book Store v. University of Wisconsin Bd. of Regents*, 1994 WL 747886, 33 U.S.P.Q.2d 1385 (Trademark Tr. & App. Bd.1994), and *Woodstock's Enterprises, Inc. v. Woodstock's Enterprises, Inc.*, 1997 WL 440268, 43 U.S.P.Q.2d 1440 (Trademark Tr. & App. Bd.1997). *See also* 2 *McCarthy on Trademarks* § 18:59 ("an oral license may be sufficient if actual control is exercised by the licensor"). These new facts coupled with this case law suggests that plaintiff has a more than negligible chance of proving that it had an implied license with the country club for the use of the mark. In turn, this evidence diminishes defendant's argument that use of the mark by the country club renders plaintiff's use non-exclusive.

Defendant argues alternatively that plaintiff has not been in business since 1995 and, thus, it has no mark to protect. Plaintiff denies this contention and notes that defendant's only evidence in support of this contention is a Wisconsin Department of Industry, Labor and Human Relations form letter sent to plaintiff requesting the transfer of payroll records for those employees of plaintiff that went to work for Bishops Bay Country Club when plaintiff sold the golf course. This is insufficient evidence to establish that plaintiff is no longer in business. Moreover, defendant stipulated to facts that contradict this

position, such as the fact that plaintiff has two remaining residential lots for sale.

Defendant argues next that third-party realtors and builders used the name Bishops Bay without a license from plaintiff, rendering plaintiff's use non-exclusive. As explained at the hearing, the fact that plaintiff allowed realtors and builders to use the name Bishops Bay without a license does not affect plaintiff's entitlement to the name. As plaintiff points out, the realtors and builders did not use the mark to identify *themselves* as the source or origin of plaintiff's services. Rather, their use is analogous to a retailer that advertises Coca–Cola in its weekly flyer. *See* 4 *McCarthy on Trademark*, § 25:41 (collecting cases).

Finally, defendant seems to arguing that Jacobsen, a third party, has rights superior to plaintiff. That might be true. However, as long as plaintiff's rights are superior to defendant's, which is uncontroverted in this case, the fact that Jacobsen might have rights superior to plaintiff's has no effect on this lawsuit. *See Committee for Idaho's High Desert v. Yost*, 92 F.3d 814, 820 (9th Cir.1996) ("third party's prior use of a trademark is not a defense in an infringement action").

Plaintiff's stance is that it has used the Bishops Bay mark for nine years. This nine-year use is important. Proof of continuous and exclusive use of a mark for five or more years establishes prima facie evidence of secondary meaning for purposes of registering the mark. *See* 15 U.S.C. § 1052(f) ("The Director may accept as prima facie evidence that the mark has become distinctive ... proof of substantially exclusive and continuous use thereof as a mark by the applicant in commerce for the five years before the date on which the claim of distinctiveness is made."); *see also Two Pesos, Inc. v. Taco Cabana, Inc.*, 505 U.S. 763, 768, 112 S.Ct. 2753, 120 L.Ed.2d 615 (1992) ("the

general principles qualifying a mark for registration under § 2 of the Lanham Act are for the most part applicable in determining whether an unregistered mark is entitled to protection under § 43(a)"). Moreover, the Court of Appeals for the Eighth Circuit has held that when a mark qualifies for registration because of the five-year rule, the use factor weighs *strongly* in favor of secondary meaning. *See Stuart Hall Co., Inc. v. Ampad Corp.*, 51 F.3d 780, 789 (8th Cir.1995). At a minimum, this factor weighs in favor of plaintiff.

(ii) amount and manner of advertising

Plaintiff argues that (1) to date it has spent $97,000 in advertising the Bishops Bay mark; (2) it uses the mark on signs along County Highway M and in advertising and promotional materials; and (3) it is in the process of developing 450 acres known as the Highlands of Bishops Bay. Moreover, plaintiff alleges that its implied licensee, Bishops Bay Country Club, has spent $24,000 over the years 2000 to 2001. Although plaintiff alleges also that there has been "additional spending by licensees," it does not say how much was spent by whom. Nevertheless, defendant does not contest the $97,000 figure. It is not an insignificant amount. Defendant argues that use the Bishops Bay mark by third-party realtors and builders in advertising diminishes plaintiff's advertising efforts, but there is no force to this argument. Defendant has adduced no evidence that the realtors and builders used the mark to identify themselves as the source of plaintiff's services. This factor weighs in favor of plaintiff.

(iii) amount of sales and number of customers

Plaintiff's acquisition and development costs for the residential and condominium

lots and the golf course were approximately $21,250,000. Plaintiff sold 56 residential lots that ranged in price from $150,000 to $325,000. Two lots remain to be sold. The 2001 assessed values of the residences range from $405,700 to $1,166,300. The 2002 assessed value of the country club is $4,224,300. Although defendant concedes that plaintiff sold 56 residential lots, it argues that "there is no evidence in this record to establish that any of these home sites were sold to 'consumers.'" Defendant speculates that the lots were sold to builders, who in turn sold them to consumers. However, plaintiff is a developer and seller of residential real estate lots. Even if defendant's speculation were true, it is meaningless. To illustrate, most consumers do not buy Coca–Cola directly from the manufacturer. Instead, they buy it from their local supermarket. Defendant could not seriously maintain that the Coca–Cola mark is not entitled to Lanham Act protection because consumers do not buy soda directly from the manufacturer. This analogy applies equally to this case. This factor weighs in favor of plaintiff.

(iv) established place in the market

The parties have stipulated that the Bishops Bay Community has developed a reputation for being an exclusive, restricted luxury community with the highest level of amenities. Accordingly, this factor weighs in favor of plaintiff.

(v) proof of intentional copying

Plaintiff argues that there is proof of intentional copying because (1) defendant fails to use the possessive apostrophe in its name and (2) there "is no evidence of any geographic place known as 'Bishops Bay.'" Plt.'s Surrebuttal, dkt. # 57, at 8–9. First, it is not clear why plaintiff continues to maintain that there is no evidence identifying Bishops Bay as a geographic location when defendant has produced a 1991 Rand McNally map that designates that area of

the lake as "Bishop's Bay." Plaintiff's geographic argument is of little value. Second, although it is undisputed that defendant was aware of the Bishops Bay County Club, Villages of Bishops Bay and Residences of Bishops Bay before it changed the apartment complex's name, it is still unclear how plaintiff came up with its name. Defendant's position seems to be that it named the apartments Bishops Bay not to copy plaintiff's mark intentionally, but because it believes the area is known as Bishops Bay. Although it is a close call, this factor does not weigh in plaintiff's favor in light of the fact that plaintiff bears the burden of proving the mark has achieved secondary meaning and proving intentional copying.

In sum, plaintiff has shown that four of the five circumstantial evidence factors weigh in its favor with continuous and exclusive use weighing perhaps strongly in its favor. Accordingly, I conclude that plaintiff has shown that it has more than a negligible chance of success on the merits of proving the Bishops Bay mark has achieved secondary meaning. However, as stated earlier, to prevail on a trademark infringement claim, a plaintiff must also show "whether the actions of a subsequent user of a substantially similar or identical mark causes [sic] a likelihood of confusion among consumers as to the source of those specific goods or services." *Platinum Home*, 149 F.3d at 726. Therefore, I turn to likelihood of confusion.

c. Likelihood of confusion

Likelihood of confusion is synonymous with probable confusion, not possible confusion. *August Storck K.G. v. Nabisco, Inc.*, 59 F.3d 616, 619 (7th Cir. 1995). Likelihood of confusion is a question of fact. *Scandia Down Corp. v. Euroquilt, Inc.*, 772 F.2d 1423, 1428 (7th Cir. 1985). The Court of Appeals for the Sev-

enth Circuit uses the following seven factors in determining whether likelihood of confusion exists: (1) similarity between the marks in appearance and suggestion; (2) similarity of the products or services; (3) area and manner of concurrent use; (4) degree of care likely to be exercised by consumers; (5) strength of complainant's mark; (6) actual confusion; and (7) intent of the defendant to "palm off his product as that of another." *See Meridian Mutual Insurance Co. v. Meridian Insurance Group, Inc.*, 128 F.3d 1111, 1115 (7th Cir. 1997).

### (i) similarity between marks

Defendant uses the name "Bishops Bay Apartments" to identify its apartment complex. Although defendant includes the generic term "apartments," the more significant portion of the mark is the modifier Bishops Bay. The words Bishops Bay in defendant's signs are larger in size than the word apartment, are displayed in a more distinctive typeface and appear first on a separate line. *See id.* ("if one word or feature of a composite trademark ·is the salient portion of the mark, it may be given greater weight than the surrounding elements"). This factor weighs in favor of plaintiff.

### (ii) similarity of services

Defendant uses its mark to identify real estate services. Both parties are in the real estate industry. To the extent defendant argues that its real estate services are different from plaintiff's, it is well established that goods or services do not need to be identical or even competitive in order for likelihood of confusion to exist. *See International Kennel Club of Chicago, Inc. v. Mighty Star, Inc.*, 846 F.2d 1079, 1089 (7th Cir.1988); *see also Helene Curtis Industries, Inc. v. Church & Dwight Co., Inc.*, 560 F.2d 1325, 1331 (7th Cir.1977) ("a trademark is entitled to protection against infringement by adverse trademarks, even

on noncompetitive products, if there is a likelihood that consumers will believe that the later mark is 'related to or connected with' the existing trademark"). This factor weighs in favor of plaintiff.

### (iii) area and manner of use

The parties' properties are directly adjacent to one another and their signs are in close proximity. Both parties use the signs to identify their respective developments. This factor weighs in favor of plaintiff.

### (iv) degree of care

Plaintiff argues that prospective tenants of the apartments would be likely to believe that the apartments are sponsored by, approved by or affiliated with plaintiff and, for this reason, share the same level of prestige and amenities as the Bishops Bay Community. Although such confusion would most likely be dispelled after a prospective tenant enters an apartment or sees the apartment complex, initial interest confusion is a form of likelihood of confusion that can trigger a finding of infringement. See 3 *McCarthy on Trademarks* § 23:6 (collecting cases); *see also Syndicate Sales, Inc. v. Hampshire Paper Corp.*, 192 F.3d 633, 638 (7th Cir.1999). This factor weighs in favor of plaintiff.

### (v) strength of mark

Plaintiff argues that the mark is strong because it is either inherently distinctive or has acquired secondary meaning. Defendant argues that the mark is weak because it is geographically descriptive, but defendant fails to address the fact that a geographically descriptive mark is protected if it has acquired secondary meaning. In this case, plaintiff has shown more than a negligible chance of success of proving secondary meaning. Moreover, plaintiff

has used the mark for nine years. This factor weighs in favor of plaintiff.

### (vi) actual confusion

The test for infringement is likelihood of confusion, not actual confusion. For the purposes of this motion, plaintiff need not prove actual confusion. *See Web Printing Controls Co., Inc. v. Oxy–Dry Corp.*, 906 F.2d 1202, 1204 (7th Cir.1990) ("when a plaintiff seeks injunctive relief a 'likelihood of confusion' is all that the plaintiff must prove, but when a plaintiff seeks monetary relief the confusion element merges with ... 'injury': a plaintiff then must prove injury as a result of actual confusion in order to prevail"). Accordingly, this factor is not relevant at this stage of the proceedings.

### (vii) defendant's intent

Although plaintiff argues that a junior user has a responsibility to avoid infringing or using a mark that is confusingly similar to that of a senior user, *G.D. Searle & Co. v. Chas. Pfizer & Co.*, 265 F.2d 385, 387 (7th Cir.1959) ("a good and safe rule to follow: 'One entering a field of endeavor already occupied by another should, in the selection of a trade-name or trade-mark, keep far enough away to avoid all possible confusion' "), the intent factor requires a showing of defendant's "intent to confuse customers, not merely the intent to use a mark that is already in use somewhere else." *Meridian Mutual*, 128 F.3d at 1120. As stated earlier with respect to the intentional copying factor of secondary meaning, this factor does not weigh in plaintiff's favor in light of the fact that plaintiff bears the burden of proving likelihood of confusion and, with it, defendant's intent.

In sum, five of the six relevant likelihood-of-confusion factors weigh in plaintiff's favor. Accordingly, plaintiff has established that it has a more than negligible chance of success of proving both that the Bishops Bay mark has achieved secondary meaning and that there is a likelihood of confusion with defendant's use of the mark. I turn now to the three remaining preliminary injunction factors.

### 2. *Irreparable harm and inadequate remedy*

■ In defendant's pre-hearing brief in opposition to plaintiff's motion for a preliminary injunction, it argued (in two sentences) that because plaintiff has not been in business since 1995, any loss can be quantified in terms of monetary damages. Defendant's post-hearing briefs are no more insightful. In any event, the parties stipulated that on the basis of amenities, defendant's apartment complex is not on a par with the Bishops Bay Community in terms of luxury. Defendant's use of the Bishops Bay mark is likely to dilute and diminish the distinctive qualities of the Bishops Bay Community and plaintiff's mark. The damage to the good will and prominence of plaintiff's mark through public confusion is an irreparable injury. *See Helene Curtis*, 560 F.2d at 1332; *see also Processed Plastic Co. v. Warner Communications, Inc.*, 675 F.2d 852, 858 (7th Cir.1982) ("damages occasioned by trademark infringement are by their very nature irreparable and not susceptible of adequate measurement for remedy at law"). Accordingly, plaintiff has made a sufficient showing that it will suffer irreparable harm with an inadequate remedy at law if preliminary relief is not granted.

### 3. *Balance of hardships*

■ This factor balances the harms plaintiff will suffer if the injunction is not granted against the harm defendant will suffer if one is granted. *Meridian Mutual*, 128 F.3d at 1120–21. The hardships are adjusted for the probability of success on the merits. *Abbott Laboratories*, 971

F.2d at 11–12. Defendant fails to address this factor. *See Central States, Southeast and Southwest Areas Pension Fund v. Midwest Motor Express, Inc.*, 181 F.3d 799, 808 (7th Cir.1999) ("Arguments not developed in any meaningful way are waived."). In any event, this factor favors plaintiff. Although the apartment complex was built in the 1970s, defendant changed the name from Willows and Century Hollow to Bishops Bay Apartments in the spring of 2002. In contrast, plaintiff has been using the Bishops Bay mark for nine years. Moreover, it is undisputed that defendant's apartment complex is similar to the Bishops Bay Community in terms of luxury and prestige. The balance of hardships weighs in favor of plaintiff, especially when adjusting for the fact that plaintiff has shown more than a negligible likelihood of success on the merits.

#### 4. *Public interest*

 This factor takes into consideration "the effect that granting or denying the injunction will have on the nonparties." *Meridian Mutual*, 128 F.3d at 1121 (internal citation omitted). Again, defendant has waived any argument on this factor by failing to address it. *See Central States*, 181 F.3d at 808. In any event, because plaintiff has used the Bishops Bay mark for nine years and defendant changed its name to Bishops Bay Apartments only recently, issuing the injunction will effectively maintain the more recent status quo and prevent harm to the general public by eliminating potential confusion. *See Meridian Mutual*, 128 F.3d at 1121. Moreover, it is in the public interest to eliminate and avoid potential confusion. This factor weighs in favor of plaintiff.

In sum, plaintiff has demonstrated that (1) it has a likelihood of success on the merits; (2) it has and will continue to suffer irreparable injury for which there is no adequate remedy at law; (3) the harm it will suffer without an injunction out-

weighs the harm defendant will suffer with an injunction; and (4) it is in the public interest to avoid potential confusion. Accordingly, plaintiff's motion for a preliminary injunction will be granted. Defendant will be enjoined preliminarily from using the name Bishops Bay in any public forum, including on any signs, promotional material, literature and advertisements.

### ORDER

IT IS ORDERED that

1. Plaintiff Bishops Bay Founders Group, Inc.'s motion for a preliminary injunction is GRANTED; defendant Bishops Bay Apartments is ENJOINED preliminarily from using the name Bishops Bay in any public forum, including on any signs, promotional material, literature and advertisements; and

2. Defendant Bishops Bay Apartments, LLC's motion to strike is DENIED.